# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. |
| 2006, white Honda Accord bearing a front California license plate number of 5UGH766 and a rear Texas license plate number of PWP1057, and bearing Vehicle Identification Number ("VIN") JHMCM56196C005640 registered to DONALDO RAMIREZ MARTINEZ at 640 Mountain View Avenue, Oxnard, California 93030 | ) 2:23-mj-06268-DUTY |

**FILED**
CLERK, U.S. DISTRICT COURT

Dec. 8, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____IV_____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | Interference with Commerce by Threats or Violence |

The application is based on these facts:

> See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jared Schacher, TFO FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: December 8, 2023

_____
*Patricia Donahue*
*Judge's signature*

City and state: Los Angeles, CA

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lyndsi Allsop x3165

**ATTACHMENT A**

VEHICLE TO BE SEARCHED

    2006, white Honda Accord bearing a front California license plate number of 5UGH766 and a rear Texas license plate number of PWP1057, and bearing Vehicle Identification Number ("VIN") JHMCM56196C005640 registered to DONALDO RAMIREZ MARTINEZ at 640 Mountain View Avenue, Oxnard, California 93030.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (Aiding and Abetting), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 922(g) (Prohibited Person in Possession of Firearms and Ammunition), 18 U.S.C. § 924 (Possession of a Deadly or Dangerous Weapon in Furtherance of a Crime of Violence), 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1029 (Fraud and Related Activity in Connection with Access Devices), 18 U.S.C. § 1343 (Fraud by Wire, Radio, or Television), and 18 U.S.C. § 1344 (Bank Fraud) (the "Subject Offenses") namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Any drug paraphernalia;

c.    Precious stones worth more than $1,000, United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds), and data, records, documents, or information pertaining to, obtaining, possessing, using, or transferring money over $1,000, such as bank account records;

d.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, including

i

correspondence, receipts, records, and documents related to times when robberies were committed and when access devices were used;

e.     Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

f.     Contents of any calendar or date book;

g.     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

h.     Records, documents, programs, applications, or materials pertaining any bank accounts, credit card accounts, or other financial accounts, including applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

i.     Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

j.     Any documents or records, including receipts, invoices, bank statements, and credit card statements, evidencing the purchase of any products or services using altered, counterfeit, or fraudulent or unauthorized checks, access devices, or other monetary instruments;

   k. Any products, goods, or merchandise purchased with fraudulent or unauthorized checks, access devices, or other monetary instruments; and

   l. Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, SILVA, RAMIREZ MARTINEZ, or REYES.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## AFFIDAVIT

I, Jared Schacher, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against OSCAR SILVA ("SILVA") for a violation of 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence).

2.   This affidavit is also made in support of an application for a warrant to search a 2006, white Honda Accord bearing a front California license plate number of 5UGH766 and a rear Texas license plate number of PWP1057, and bearing Vehicle Identification Number ("VIN") JHMCM56196C005640 registered to EDWARD DONALDO RAMIREZ MARTINEZ ("RAMIREZ MARTINEZ")[1] at 640 Mountain View Avenue, Oxnard, California 93030 ("SUBJECT VEHICLE") as described more fully in Attachment A.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 2 (Aiding and Abetting), 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 922(g) (Prohibited Person in Possession of Firearms and Ammunition), 18 U.S.C. § 924 (Possession of a Deadly or Dangerous Weapon in Furtherance of a Crime of Violence), 18 U.S.C. § 1951 (Interference with Commerce by Threats or Violence), 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1029 (Fraud and Related Activity in Connection with

---

[1] The registration specifically states "Donaldo Ramirez Martinez" and does not include RAMIREZ MARTINEZ' first name.

Access Devices), 18 U.S.C. § 1343 (Fraud by Wire, Radio, or Television), and 18 U.S.C. § 1344 (Bank Fraud) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the search warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All dates, times, and amounts are approximate.

## II. BACKGROUND OF AFFIANT

5.   I, Jared Schacher, am a peace officer in the State of California, City of Oxnard, and I am also a deputized Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI").  I have been a peace officer for the Oxnard Police Department for 12 years.  I have been an FBI TFO for approximately one year.  At the FBI, I am assigned to the Ventura County Violent Gang Task Force.

6.   With the Oxnard Police Department, I am currently assigned as a detective in the Violent Crimes Unit, which primarily investigates shootings, stabbings, kidnappings, robberies, and other violent crimes.  Prior to being in the Violent Crimes Unit, I was a detective in the Property Crimes

Unit, where I primarily investigated burglaries, arsons, thefts, stolen vehicles, fraud, and other crimes against persons.  My education, training, and experience in the enforcement of the laws pertaining to property crimes are as follows:

       a.   I attended and graduated from the Ventura County Criminal Justice Training Center in 2011 and received approximately 947 hours of training.  While attending training, I received training and instruction on criminal investigations involving crimes against persons.

7.   My initial assignment in the Oxnard Police Department was in the patrol division as a patrol officer.  I responded to calls for service and investigated suspected criminal activity. I interviewed members of the community about criminal activity in their neighborhoods and encountered suspected gang members during my duties.  I have interviewed and arrested gang members from Colonia Chiques, Southside Chiques, Surtown, Squires Drive, Loma Flats, Northside Chiques, El Rio, Lemonwood Chiques, Black Mafia Gangsters and West Side Gangster Crips.

8.   During my time with the Oxnard Police Department, I have received an additional 100 hours of training in the detection and investigation of crimes and apprehension of criminals.  I have had numerous hours of training related to the investigation of violent crimes, arson, narcotics related crimes, theft, burglary, fraud, forgery, identity theft, domestic violence, child abuse, and sexual assaults.  This training was provided in part by the Ventura County Sheriff's Office, California Narcotic Officer Association, and several

other California Peace Officer Standards and Training (P.O.S.T.) approved organizations.  I have also received ongoing training from working with experienced sexual assault, gang crime, narcotic crime, robbery, and property crime investigators. I possess Basic, Intermediate, and Advanced P.O.S.T. certificates.

9.   In February 2020, I completed a 40-hour homicide investigation class which focused on initial homicide investigations, arson homicides; officer involved shooting investigations, child and elder homicide investigations, and the handling of homicide crime scenes.

10.   In November 2020, I attended a 40-hour ICI Arson and Explosives Course at the Robert Presley Institute of Criminal Investigation.  During that course, I received instruction regarding the investigation of arson and explosives cases and the methodology and ideology of suspects involved in those crimes.  I also attended a 40-hour course taught by Tom Bruce of Hawk Analytics on cellular phone call data records, which included instruction on how to map and use them in criminal investigations.  In August 2023, I attended the 40-hour ICI Gang Investigation Course at the Robert Presley Institute of Criminal Investigation.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

11.   From approximately November 4, 2023, to November 26, 2023, a man (later identified as SILVA) committed at least five robberies within Ventura County, California.[2]  Specifically, in

---

[2] Ventura County is within the Central District of California.

Oxnard, SILVA robbed a taco vendor of tacos, soda, and cash; another taco vendor of cash; a smoke shop of cigarettes and cash; and a convenience store of beer and cash. In Ventura, SILVA, seemingly with assistance from RAMIREZ MARTINEZ who was driving the getaway car (SUBJECT VEHICLE), robbed a female pedestrian of her pursue, which contained her California ID card and approximately four of her and her sister's credit and debit cards. SILVA is captured on film committing three of the five robberies, and separately, the victim in a fourth robbery positively identified SILVA in a six-pack lineup.

12. At each robbery, SILVA brandished[3] what appeared to be a handgun at his victims to intimidate them. The total amount of cash taken during all five robberies was over $1,300. In addition, during the robberies, SILVA stole goods, products, and items worth over $50. SILVA spent over $280 using one of the female pedestrian's credit cards. RAMIREZ MARTINEZ spent over $90 using the female pedestrian's sister's debit card, which was also in the female pedestrian's purse. And a third person (DAVID REYES, "REYES") spent approximately $18 using one of the female pedestrian's credit cards. Collectively, the female pedestrian's purse and the items inside of it were worth over $1,000. Neither the female pedestrian nor her sister gave SILVA, RAMIREZ MARTINEZ, or REYES consent to use or possess their cards.

---

[3] The term "brandish" means "to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, to intimidate that person, regardless of whether the firearm is directly visible to that person." 18 U.S.C. § 924(c)(4).

13.   Patrons at the smoke shop and convenience store that SILVA robbed used credit cards to tender payment.  One of the taco vendors that SILVA robbed sold tacos out of his truck, an automobile.  This same taco vendor also accepted payment from his customer's through Zelle, a digital payment application that uses the wires to transfer money between two user's respective bank accounts.  Automobiles, credits cards, and the wires are facilities of interstate and foreign commerce.  Accordingly, the robberies that SILVA committed affected interstate and foreign commerce.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    November 6, 2023: Suspected[4] Armed Robbery of a Taco Stand in Oxnard**

14.  Based on my conversations with Oxnard Police Department Officer Roque Rivera, my review of his notes and reports, and my own knowledge of the investigation, I am aware of the following:

a.    On November 6, 2023, at 10:25 a.m., Officer Rivera responded to the area of Pacific Avenue and Mountain View Avenue in Oxnard regarding a reported armed robbery of a taco vendor.  Upon his arrival, Officer Rivera spoke with a male taco vendor ("Victim 1").  Victim 1 told Officer Rivera the following:

---

[4] Because the handgun has not yet been analyzed and determined to be real, I refer to the robberies as "suspected armed robberies" throughout the affidavit.

      i.   On November 6, 2023, around 10:00 a.m., Victim 1 was standing next to his truck[5] selling tacos when a man approached him and ordered tacos.

      ii.  The man showed Victim 1 a handgun in his backpack and refused to pay for the tacos.  The man also demanded that Victim 1 give him money.

      iii. Victim 1 was afraid and handed the man $20 and six tacos with a can of soda, which the man did not pay for. According to Victim 1, the six tacos were worth approximately $10, and the soda was worth approximately $2.

      iv.  Victim 1 described the man who robbed him as a Hispanic man between the age of 20 and 30 years old. According to Victim 1, the robber was between 5'8" and 5'10", and he had black hair with blond streaks.

      v.   The robber rode away on a silver BMX-style bicycle.

15.  On November 30, 2023, I spoke Victim 1 and asked him what types of payment he accepts at his taco truck.  Victim 1 responded that he accepts Zelle payments from his customers.

16.  Based on my conversations with Oxnard Police Department Officer Luis Ortiz, my review of Officer Ortiz' notes and reports, and my own knowledge of this investigation, I know that after SILVA was identified as a suspect in a robbery committed on November 10, 2023, in Ventura, California, which is described below in Subsection IV(B), Oxnard Police Department

---

[5] Based on a conversation that I had with Victim 1 on November 30, 2023, I know that Victim 1 pre-prepares tacos, places them in his truck, and uses his truck to sell the tacos.

officers determined that SILVA may have also committed the taco truck robbery on November 6, 2023.  Accordingly, on November 30, 2023, around 12:00 p.m., near a residence on J Street in Oxnard, Officer Ortiz presented Victim 1 with a six-pack and asked him if the person who robbed him was depicted in any of the photographs.  The six-pack included a photograph of SILVA. Victim 1 positively identified SILVA as the man who robbed him.

**B.   November 10, 2023: Suspected Armed Robbery of a Female Pedestrian in Ventura**

17.   Based on my conversations with Ventura Police Department Detective Zach Ingram, my review of his notes and reports, and my review of surveillance footage, I am aware of the following:

a.   On November 10, 2023, around 9:50 p.m., a woman ("Victim 2") and her friend (also a woman) were walking from a local bar in downtown Ventura when SILVA robbed Victim 2 at gun point.  Specifically, Victim 2 and her friend were on Main Street in front of Mission Park when SUBJECT VEHICLE passed them and parked in front of them.  A man (later identified as SILVA) exited the front passenger's side door of SUBJECT VEHICLE and approached the two women on foot.  The man pointed a gun at Victim 2 and began yelling at her in Spanish.  The man then grabbed Victim 2's purse, which was slung across her shoulder. Victim 2 feared for her life and believed the man was going to shoot her, so she did not fight back and instead, relinquished the purse to him.

b.   The man got into the front passenger's seat of SUBJECT VEHICLE with Victim 2's purse, and the car drove away. Victim 2 had approximately four credit and debit cards and her California ID card in the purse the man took.  Three of the cards belonged to Victim 2, and one card belonged to Victim 2's

sister.  According to Victim 2, her purse was worth
approximately $200.  Victim 2 also had several items inside of
the purse worth significant value, including a purple Apple
iPhone 11 and a Coach wallet.  According to Victim 2, these
items were worth approximately $1,000.

    c.  After the robbery, Victim 2 and her sister began
receiving bank notifications that their stolen cards were being
used at various locations in Oxnard and Ventura, including a
Walmart[6] in Ventura and the La Vida Loca Smoke Shop in Oxnard.

    d.  On November 11, 2023, Victim 2 and her sister
alerted the Ventura Police Department that their cards were
being used, and on November 14, 2023, Detective Ingram began
conducting a follow-up investigation.

    e.  On November 14, 2023, around 10:30 a.m.,
Detective Ingram interviewed Victim 2 and her friend separately
at first and then together.  In addition to Victim 2 and her
friend providing the above-stated description of the robbery,
Victim 2 described the man who robbed her as Hispanic man in
either his twenties or early thirties.  Victim 2 stated that the
robber had a black beard, was 5'6", and weighed between 150 and
160 pounds.  Victim 2 described the robber as wearing a black
ski mask or beanie on top of his head and a dark colored jacket.[7]

---

[6] Walmart is an American multinational corporation retail
corporation that operates a chain of hypermarkets (also called
supercenters), discount department stores, and grocery stores in
the United States, headquartered in Bentonville, Arkansas.  It
accepts credit cards and sells products that have traveled in
interstate and foreign commerce.

[7] The friend's description of the robber matched Victim 2's
description.

f.    During the interview, Victim 2's friend also
stated that she was afraid for her life when the robber took
Victim 2's purse and pointed his handgun at them.

g.    On November 15, 2023, Detective Ingram reviewed
video surveillance footage that he consensually obtained from
Walmart and the La Vida Loca Smoke Shop[8].

h.    In the Walmart footage, a Hispanic man matching
Victim 2 and her friend's description of the robber is seen
using at least one of Victim 2's credit cards on November 10,
2023, around 10:24 p.m., purchasing items totaling approximately
$284.46.  Detective Ingram verified the purchase amounts by
reviewing Victim 2's bank transaction records and transaction
receipts from the store.  SILVA was also seen on surveillance
footage getting in and out of SUBJECT VEHICLE at the Walmart.
In addition, a second Hispanic man (later identified as RAMIREZ
MARTINEZ)[9] is depicted on that same date at 10:25 p.m. using
Victim 2 sister's debit card at the same Walmart, purchasing
items totaling $92.04.  Detective Ingram verified the purchase
amounts by reviewing Victim 2's sister's bank transaction
records and transaction receipts from the store.

---

[8] The La Vida Loca Smoke Shop accepts credit cards and sells
products have traveled in interstate and foreign commerce.

[9] Based on my conversations with Detective Ingram, I am
aware that Detective Ingram reviewed RAMIREZ MARTINEZ' booking
photograph from his November 15, 2023 arrest and compared it to
the surveillance footage.  Based on his review, he determined
that RAMIREZ MARTINEZ is the second Hispanic male depicted on
surveillance footage using Victim 2's credit card.

i.   In the La Vida Loca Smoke Shop footage, a person who Detective Ingram identified as REYES[10] is depicted using Victim 2's credit card to purchase a torch lighter for $18.99. Detective Ingram verified the purchase amount by reviewing Victim 2's bank transaction records and transaction receipts from the store.

j.   Officer Ingram consensually obtained video surveillance from a surveillance camera owned and operated by the City of Ventura that is located at 100 E. Main Street.  This footage captured the robbery itself.  The person depicted in the robbery footage (later determined to be SILVA) appears to be the same person in the footage from the Walmart using at least one of Victim 2's credit cards.  In the footage depicting the robbery, SILVA is wearing a distinct olive-green vest and a maroon shirt.  The green vest is somewhat distinct because the vest is sleeveless, has several pockets in the front.

18. Based on my conversations with Detective Ingram and my review of his notes and reports, I am aware of the following:

---

[10] Based on my conversations with Detective Ingram, I know that Detective Ingram identified REYES based on the use of a nickname "D-ray" that REYES provided to the store clerk.

a.   On November 28, 2023, Detective Ingram reviewed video surveillance footage from November 10, 2023 depicting the robbery and SILVA purchasing items from Walmart.   Detective Ingram also reviewed SILVA's booking photo from his arrest on November 20, 2023.[11]   Based on a comparison between the images, Detective Ingram positively identified SILVA as the person who robbed Victim 2.   Of note, SILVA was wearing the same maroon shirt in his November 20th booking photo that he was wearing during the November 10th robbery.   SILVA also matched the physical description that Victim 2 provided Detective Ingram.

   

*Walmart Surveillance Footage*              *Booking Photo*

**C.   November 15, 2023: Arrest of RAMIREZ MARTINEZ and Recovery of SUBJECT VEHICLE**

19.   Based on my conversations with Ventura County Sheriff Deputy Jason Abboud and my review of his notes and reports, I am aware of the following:

---

[11] Following his arrest, SILVA took a booking photo, as is common practice with arrestees.

a.    On November 15, 2023, RAMIREZ MARTINEZ was
arrested by the Ventura County Sheriff's Office for possession
of a controlled substance, in violation of California Health and
Safety Code Section 11377(a).  Specifically, on November 15,
2023, around 11:33 a.m., Deputy Abboud was dispatched to Point
Mugu Missile Park in Ventura, California, in response to a
request from the Naval Base Police Department regarding an
occupied vehicle that was in the road where the driver appeared
to be "laid out."[12]

b.    Prior to the dispatch call, a Naval Base Police
Lieutenant (the "Lieutenant") approached SUBJECT VEHICLE, where
he saw RAMIREZ MARTINEZ "laid out" in the driver's seat and
noticed a smoke pipe in plain view.  The Lieutenant opened the
SUBJECT VEHICLE's door and smelled the odor of marijuana.  The
Lieutenant pulled RAMIREZ MARTINEZ from SUBJECT VEHICLE, given
his inebriated state, and placed him in the back of one the
Naval Base department vehicles until further assistance arrived.
The Lieutenant searched RAMIREZ MARTINEZ and found, among other
things, a razor blade and a debit card that belonged to Victim
2's sister.  Because RAMIREZ MARTINEZ, appeared to be under the
influence, and the Lieutenant smelled marijuana, the Lieutenant
conducted a cursory search of SUBJECT VEHICLE.  In SUBJECT
VEHICLE, the Lieutenant found a white crystalline substance in
the center console.

---

[12] Based on my own training and experience, I believe that
"laid out" likely means that he was slumped over in the car and
seemingly inebriated while behind the wheel.

c.   When he arrived, Deputy Abboud arrested RAMIREZ MARTINEZ and had SUBJECT VEHICLE impounded.  Deputy Abboud also conducted a field test of the crystalline substance, which tested as presumptive positive for methamphetamine.

d.   Based on Department of Motor Vehicle Records, which I viewed on December 5, 2023, I am aware that SUBJECT VEHICLE is registered to RAMIREZ MARTINEZ at 640 Mountain View Avenue in Oxnard, California 93030.

e.   SUBJECT VEHICLE is currently in the custody of the Ventura County Sheriff's Department, as it was impounded incident to RAMIREZ MARTINEZ' arrest.

**D.  November 25, 2023: Suspected Armed Robbery of Royal Spade Smoke Shop in Oxnard**

20.  Based on my conversations with Oxnard Police Department Officer Tom Payn and my review of his notes and reports, I am aware of the following:

a.   On November 25, 2023, around 12:40 p.m., Officer Payne was dispatched to the Royal Spade Smoke Shop,[13] located at 1037 S. Ventura Road in Oxnard regarding an armed robbery.  Upon his arrival, Officer Payn spoke with a female employee ("Victim 3").  Victim 3 told Officer Payn the following:

i.   On November 25, 2023, around 1:00 p.m., Victim 3 was working as a clerk at the smoke shop when a man (later identified as SILVA) walked inside and began asking Victim 3 about products inside the store.  The man approached the checkout counter, lifted his sweatshirt, and exposed a

---

[13] Royal Spade Smoke Shop accepts credit cards and sells products that have traveled in interstate and foreign commerce.

handgun in his front waistband.  The man demanded money and a pack of cigarettes.

        ii.  Victim 3 feared for her life and handed the man a pack of cigarettes and approximately $300 in cash from the register.  According to Victim 3, the cigarettes were worth approximately $10.

        iii. The man told Victim 3 that if she called the police, he would kill her.

        iv.  The man exited the store after Victim 3 gave him the money and cigarettes (which he did not pay for) and rode away on a silver BMX-style bike.

        v.   Victim 3 described the robber as a Hispanic man who was between 30 and 33 years old.  According to Victim 3, the man was approximately 5'9", he had a medium build, and he had brown hair with blonde tips.

        b.   Because Victim 3's description of the robber was similar to Victim 1's, and in addition, because the robber appeared to use the same mode of transportation that the taco truck robber did on November 10, 2023, officers believed that the same person robbed both locations.  This belief was later confirmed when Victim 1 positively identified SILVA in a six-pack as described in Subsection IV(A).

        c.   Officers consensually obtained surveillance footage from the smoke shop.  Officer Mancilla was among the officers on scene.  Upon viewing the footage of the suspect, Officer Mancilla immediately recognized and identified the robber as SILVA.






*Smoke Shop Surveillance Footage*          *Booking Photo*

**E.   November 26, 2023: Suspected Armed Robbery of C Street Market in Oxnard**

21.   Based on my conversations with Oxnard Police Department Officer Tim Castor and my review of his notes and reports, I am aware of the following:

a.   On November 26, 2023, Officer Castor was dispatched to the C Street Market,[14] located at 122 N. C Street in Oxnard regarding an armed robbery.  Upon his arrival, Officer Castor spoke with a female cashier ("Victim 4") who told him the following:

i.   Victim 4 was working behind the counter of the business when a man (later identified as SILVA) entered the store.  The man went to the cooler and retrieved two cans of beer.  The man approached the counter with the two cans of beer that he had selected and pointed a handgun at Victim 4.

ii.   The man told Victim 4 to open the register or else he was going to shoot her.  Victim 4, who feared for her

---

[14] C Street Market accepts credit cards and sells products that have traveled in interstate and foreign commerce.

life, complied.  Victim 4 handed the man approximately $1,000 in mixed denominations from the register.

        iii. The man left with the cash and the two cans of beer (which he did not pay for).  According to Victim 4, the two cans of beer were worth approximately $10.

        iv.  Victim 4 described the robber as a Hispanic man, who was approximately 5'9" tall and weighed around 200 pounds.  Per Victim 4, the robber was wearing a blue sweatshirt with a "Champion" logo on the front with white letters.

        b.   Officers consensually obtained the store's surveillance footage.  Oxnard Police Department Officer Devin Norgberg, who was familiar with the robbery of the Royal Spade Smoke Shop that had occurred the day prior, viewed the surveillance footage and concluded that SILVA had robbed both locations.

          

*Store Surveillance Footage*        *Booking Photo*

**F.   November 26, 2023: Suspected Armed Robbery of a Second Taco Stand in Oxnard**

22.   Based on my conversations with Oxnard Police Department Officer Ricardo Garcia and my review of his notes and reports, I am aware of the following:

a.   On November 26, 2023, around 11:26 p.m., Officer Garcia was dispatched to Hueneme High School on W. Bard Road in Oxnard regarding an armed robbery of a taco vendor.  Upon his arrival, Officer Garcia spoke with a female taco vendor ("Victim 5"), who stated the following:

i.   On November 26, 2023, around 11:20 p.m., Victim 5 was working at her taco stand when a man approached her and ordered three quesadillas.  As she was preparing the quesadillas, the man removed a handgun from his sweatshirt pocket, cocked the gun, and demanded money.  Victim 5 feared for her life and handed the man $8.  The man was angry that that was all the money he was given, and he stated that he would return for more money before he walked away.  The man did not take the quesadillas before he left.

ii.   Victim 5 described the robber as a Hispanic man, who was approximately 6'0", and at the time of the robbery, was wearing a blue sweatshirt with a "Champion" logo on the front, which was the same sweatshirt SILVA was wearing earlier in the day when he robbed the C Street Market.  Based on Victim 5's description, I believe that SILVA also robbed Victim 5.

b.   Investigators have made efforts to contact Victim 5, but the telephone number that she provided is not in service and investigators have not seen her since the robbery.

**G.   At Least Three of the Suspected Armed Robberies Affected Interstate and/or Foreign Commerce[15]**

23.   Based on my conversations with Oxnard Police Department Officers Payn and Castor and my review of their notes and reports, I am aware of the following:

a.   Patrons at the Royal Spade Smoke Shop and C Street Market use credit cards to pay for goods and services. The use of credit cards affects interstate and/or foreign commerce.[16]   Accordingly, SILVA's robbery of the Royal Spade Smoke Shop and the C Street Market, businesses that use credit cards, affected interstate and foreign commerce.

---

[15] "To establish the interstate commerce element of a Hobbs Act charge, the government need only establish that a defendant's acts had a de minimis effect on interstate commerce." United States v. Lynch, 437 F.3d 902, 908-09 (9th Cir. 2006) (emphasis added).  The interruption of a business engaged in interstate commerce is sufficient. United States v. Fierro, 450 F. App'x 586, 588 (9th Cir. 2011) (finding police investigation following robbery of the business, and the resulting interruption in the business, was sufficient to prove interstate commerce).  Robbery of a single individual for a very large sum can directly affect interstate commerce. See United States v. Wang, 222 F.3d 234, 239 (6th Cir. 2000) ("The federal courts have acknowledged, for example, that victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the potential directly to affect interstate commerce.")

[16] "[O]ne can reasonably infer that a credit card company is engaged in or affects interstate commerce." United States v. Bazuaye, 240 F.3d 861, 864 (9th Cir. 2001) (citing United States v. Brown, 31 F.3d 484, 489 n.4 (7th Cir.1994) ("Banks which process credit card charges, presumably from consumers in many states, clearly affect interstate commerce.")).

b.   The owner of one of the taco businesses (Victim 1) utilized his truck, as opposed to a brick and motor store front, to sell his tacos.  Automobiles, like trucks, are facilities of interstate and/or foreign commerce.[17]  In addition, Victim 1 accepted payment from his customer's through Zelle.  Zelle is a United States-based digital payments network run by a private financial services company owned by multistate national banks, including Bank of America, Truist, Capital One, JPMorgan Chase, PNC Bank, U.S. Bank, and Wells Fargo.[18]  Zelle enables users to electronically transfer money from their bank account to another registered user's bank account (within the United States) using a mobile device or the website of a participating banking institution.[19]  The wiring and transferring of money from one bank account to another affects interstate and foreign

---

[17] See United States v. Randolph, 93 F.3d 656, 660 (9th Cir. 1996) ("[C]ars are themselves 'instrumentalities' of interstate commerce."), abrogated on other grounds by Holloway v. United States, 526 U.S. 1 (1999); see United States v. Oliver, 60 F.3d 547, 550 (9th Cir. 1995) ("[C]ars are themselves instrumentalities of commerce which Congress may protect."); see also United States v. Windham, 53 F.4th 1006, 1013 (6th Cir. 2022) (holding that "cars and phones are instrumentalities of interstate commerce" such that "intrastate use of a[n] . . . automobile satisfies" federal kidnapping statute's "interstate commerce requirements"); see also United States v. Protho, 41 F.4th 812, 829 (7th Cir. 2022) ("[W]e do not agree with Protho's view that the Commerce Clause asks us to consider each automobile's specific use in interstate commerce.  Instead, it's the nature of the regulated object's class (here, automobiles) rather than the particular use of one member of that class . . . that matters. . . Nearly all circuits have followed this course when faced with similar questions, and no circuit has adopted Protho's proposal.") (collecting cases) (emphases added).

[18] Zelle, What's Zelle? Glad You Asked!, available at https://www.zellepay.com/ (last accessed Dec. 6, 2023).

[19] Id.

commerce.[20]  Accordingly, SILVA's robbery of one of the taco vendors affected interstate and/or foreign commerce.

### H.    SILVA and RAMIREZ MARTINEZ Are Likely Prohibited from Possessing Firearms and Ammunition Due to Their Drug Use

24.  As previously stated, based on my conversations with Officer Mancilla and my review of his notes and reports, I am aware that on November 20, 2023, Officer Mancilla arrested SILVA for possession of drug paraphernalia, in violation of California Health and Safety Code Section 11364(a).  Specifically, SILVA possessed a glass smoking pipe in his left front pocket.  Based on my training and experience, I am aware that users of controlled substances, or drug addicts, are typically the persons who possess drug paraphernalia like a glass pipe.  In my experience, a glass pipe is commonly used to ingest methamphetamine.

25.  As previously stated, based on my conversations with Deputy Jason Abboud and my review of his notes and reports, I am aware that on November 15, 2023, Deputy Abboud arrested RAMIREZ MARTINEZ for possessing a controlled substance, in violation of California Health and Safety Code Section 11377(a).  At the time of his arrest, RAMIREZ MARTINEZ was in possession of approximately 9.9 grams of crystal methamphetamine.  Based on my training and experience, such a small amount tends to indicate that, at least on this specific occasion, RAMIREZ MARTINEZ was likely possessing the methamphetamine for his own personal use.

---

[20] United States v. Jinian, 725 F.3d 954, 968 (9th Cir. 2013) ("Wires are channels or instrumentalities of interstate commerce.").

26.   Per 18 U.S.C. § 922(g)(3), it is unlawful for a user of, or a person addicted to, controlled substances, like methamphetamine, to possess firearms and ammunition.  Based on the presence of methamphetamine and drug paraphernalia during their respective arrests, I believe that SILVA and RAMIREZ MARTINEZ may be drug users or addicts, and thus, persons who are prohibited from possessing firearms and ammunition.[21]

**I.   RAMIREZ MARTINEZ Is Also Prohibited from Possessing Firearms and Ammunition Because He Is a Felon**

27.   On or about December 6, 2023, I reviewed Criminal Identification and Information ("CII") documents and Consolidated Criminal History Reporting System ("CCHRS") documents and learned that RAMIREZ MARTINEZ has previously been arrested for the following felony punishable by a term of imprisonment exceeding one year:

a.   Carrying a loaded firearm in public without being the registered owner, in violation of California Penal Code Section 25850(C)(6), in the Superior Court of the State of California, County of Ventura, case number 2020003579, on or about March 24, 2020.

28.   Per 18 U.S.C. § 922(g)(1), it is unlawful for a felon to possess firearms and ammunition.  Because he has been convicted of a felony, RAMIREZ MARTINEZ is prohibited from possessing firearms and ammunition.

---

[21] To be clear, the fact that either person may be a drug user or addict does not mean that they do not also possess, sell, transport, or manufacture controlled substances for the purpose of distributing them, or otherwise engage in unlawful drug dealing or trafficking practices.

### J.   December 2, 2023: RAMIREZ MARTINEZ Is Arrested While in Possession of a Firearm and a Controlled Substance

29.   Based on my conversations with Oxnard Police Department Officer Stephen Lisman, my review of his notes and reports, and my own knowledge of this investigation, I am aware that RAMIREZ MARTINEZ is presently detained in relation to his December 2, 2023, arrest for, among other things, being a prohibited person in possession of a firearm and ammunition, possession of a high-capacity magazine, being under the influence of a controlled substance while in possession of a firearm, and possession of methamphetamine.

### K.   December 7, 2023: SILVA Is Arrested on a Ramey Warrant

30.   Based on my own knowledge of the investigation, I am aware that on December 7, 2023, SILVA was arrested by Oxnard Police Department Officers on a Ramey Warrant issued in relation the above-mentioned suspected armed robberies.  Officers conducted a search incident to his arrest of the vehicle SILVA was riding in as passenger.  Officers found a blue "Champion" sweatshirt inside of the car.  This appears to be the same sweatshirt that SILVA wore when he robbed Victims 4 and 5.

### V.  TRAINING AND EXPERIENCE REGARDING ROBBERIES AND FIREARMS OFFENSES

31.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who use firearms in criminal activities, like robberies, tend to illegally purchase the firearms so that firearms will not be traced back to them.

b.   Persons who use firearms in criminal activities, like robberies, also tend to favor "ghost guns" that is, firearms that have no distinguishable manufacturer's mark or serial number, also to avoid law enforcement tracing the firearms back to them.

c.   Persons who use firearms in criminal activities, like robberies, additionally tend to favor using stolen firearms, again, to prevent law enforcement from tracing the firearm back to them.

d.   Persons who possess or purchase firearms generally keep their firearms on their person or store their firearms in either their residences or their vehicles.

e.   Persons who possess or purchase firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residences, or in places that are readily accessible, like their vehicles, and under their physical control, such as in their digital devices. It has been my experience that individuals who purchase firearms illegally will keep the contact information of the individual who is supplying the firearms for future purchases or referrals. Such information is also typically kept on digital devices or in the person's residence or vehicle.

f.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves

24

possessing or using firearms on their digital devices.  These
photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

g.   Those who illegally possess firearms, or possess
firearms for the purpose of engaging in criminal activity, often
sell their firearms and purchase firearms.  Correspondence
between persons buying and selling firearms often occurs over
phone calls, e-mail, text message, and social media message to
and from smartphones, laptops, or other digital devices.  This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that they sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

**VI. TRAINING AND EXPERIENCE REGARDING FRAUD AND IDENTITY THEFT**

32.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
identity theft, I know the following:

a.   It is a common practice for those involved in
access device fraud, bank fraud and wire fraud to use either
false identification or stolen real identification to make

purchases with stolen access devices at retail stores to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions on their person.

### VII. CONCLUSION

33.  For all of the reasons described above, there is probable cause to believe that SILVA has committed a violation of 18 U.S.C. § 1951: Interference with Commerce by Threats or Violence.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of SUBJECT VEHICLE as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  8th   day of
December  , 2023.

*Patricia Donahue*
_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE